IN THE MATTER OF NORMAN J. CHIDIAC, AN
ATTORNEY-AT-LAW.

Argued September 14, 1987—Decided November 20, 1987.

*Richard J. Engelhardt,* Assistant Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*William F. Rabbat,* argued the case for respondent (*Rabbat & Rabbat,* attorneys).

PER CURIAM.

This matter arises out of respondent's forgery and delivery to a bank of an inheritance tax waiver. After the Attorney General determined not to proceed with a criminal prosecution, the District XI Ethics Committee (the Committee) returned a presentment on August 15, 1984. While the matter was proceeding through the disciplinary system, two additional complaints were filed against respondent. We are informed that the investigation of those matters could take six months. In its decision of February 18, 1987, the Disciplinary Review Board (DRB) recommended that respondent be suspended indefinitely,

pending resolution of those complaints. Three members voted to disbar. We agree with the recommendation of the DRB.

-I-

In its decision, the DRB made the following factual findings:

Respondent had been the attorney for H. Lester Mower and his family for many years. On July 24, 1975, Elva Mower, his wife, died testate. Mr. Mower was appointed executor. Respondent was retained to probate the estate. On February 18, 1977, Mr. Mower was granted letters testamentary. Respondent offers no explanation for this delay.

Respondent was then requested to prepare and file an inheritance tax return with the transfer inheritance tax branch in Trenton. Respondent testified before the District Ethics Committee that he was unfamiliar with estate matters, had never prepared such a return and, therefore, procrastinated.

At the time of her death, Elva Mower owned 1,250 shares of common stock in the Wood Ridge National Bank, worth approximately $100,000. Mr. Mower asked the bank to locate a purchaser. By May 1979, one had been located, and Mr. Mower and the bank both began to exert pressure on respondent to forward the appropriate documents so that the transfer could be completed. Respondent, however, had not yet prepared or filed the inheritance tax return and could not furnish an inheritance tax waiver. Thus, in an effort to expedite the matter and to cover up his neglect, he photocopied a legitimate tax waiver with the seal of the Division of Taxation, superimposed information relating to the Mower estate, and on May 10, 1979, had a photocopy of this false tax waiver delivered to the bank.

The bank noted that the purported tax waiver was a photocopy and telephoned respondent to request the original. Respondent informed the bank that he thought he had forwarded the original and he could not locate the original in his file. The bank then also made several telephone calls to the inheritance tax bureau in Trenton, but no one in that office could locate the file.

Following the telephone call from the bank, respondent approached his cousin, an attorney with whom respondent was associated, and explained what he had done. This attorney immediately helped respondent prepare the inheritance tax return.

On May 11, 1979, respondent delivered the inheritance tax return to the transfer inheritance tax bureau in Trenton. When he arrived, the employees recognized the name of the decedent and informed the superintendent of the branch, William Mulholland, that respondent was in the office with the tax return. Mr. Mulholland requested respondent come into his office. Once confronted by Mr. Mulholland, respondent admitted he had prepared a false tax waiver for the bank. Respondent then paid $2,000 from his own funds to cover the inheritance tax. On May 14, 1979, a legitimate inheritance tax waiver was issued.

Following the conclusion of an investigation by the Attorney General's Office, the matter was referred to the attorney ethics system. A formal ethics hearing was held in June, 1984. Respondent testified before the committee that he ultimately received a fee of $7,500, which he believed included reimburse-

ment for the inheritance tax he had personally paid. Respondent also testified that Mr. Mower had insisted that he accept the fee. Additionally, respondent testified that the pressure from the bank and from his client had caused him to act out of "just stupidity." He was unable to state with specificity what he was thinking when he prepared the false document, although he did assert that he had never actually formed an intent to deceive anyone. No one was harmed by his actions. Moreover, respondent had a high volume practice and was engaged in a great deal of *pro bono* legal work. "I guess that is one of my problems. I take on more than I should, * * *." Respondent also stated that he was going through a divorce at this time. Finally, although the matter was forwarded to the Office of the Attorney General, the investigator concluded that respondent had had no intent to defraud, and no criminal indictment was sought.

Based upon the above actions, the committee found that respondent's conduct in failing to file the inheritance tax return in a timely manner violated *DR* 1–102(A)(1) and (6) and *DR* 6–101(A)(1). Further, his action in preparing a false inheritance tax waiver violated *DR* 1–102(A)(1), (4) and (6) and *DR* 6–102 and *DR* 7–102(A)(5).

[Transcript references and footnote omitted.]

Our independent review of the record leads us to the same conclusion.

–II–

Based on its factual findings, the DRB reached the following conclusion and recommendation:

Upon a review of the full record, the Board is satisfied that the conclusions of the committee in finding unethical conduct on the part of respondent were fully supported by clear and convincing evidence. Respondent misrepresented the status of the matter to his clients. He fully and frankly admitted he knowingly prepared a false inheritance tax waiver and presented that false document to the bank. Respondent's conduct was unethical and in violation of *DR* 1–102(A)(1), (4) and (6), *DR* 6–101(A)(1), *DR* 6–102 and *DR* 7–102(A)(5).

If it had been demonstrated that respondent had been engaged in criminal activity involving forgery or falsification, the penalty imposed would almost certainly be disbarment. *Matter of Yacavino*, 100 *N.J.* 50, 54 (1985). Even absent criminal intent, moreover, perpetration of a fraud can warrant disbarment. *Id.* See *In re Fleisher*, 66 *N.J.* 398 (1975).

Nonetheless, the goal of discipline of attorneys is not punishment, but protection of the public. *In re Infinito*, 94 *N.J.* 50, 57 (1983). Mitigating circumstances must be considered. See *In re McNally*, 81 *N.J.* 304, 306 (1979). Respondent admits confrontation with a situation beyond his capabilities. He claims he sought and received no personal gain. His client, an old family friend, insisted that he accept a fee. Further, he cooperated with the District Ethics Committee and the Disciplinary Review Board. Finally, respondent asks that the Board consider his heavy involvement in *pro bono* legal work.

The Board considers respondent's conduct to be most serious and to warrant, at a minimum, a suspension. See *Matter of Yacavino, supra*, 100 *N.J.* at 55 (forging a judge's name to an adoption order resulted in a three year suspension); *In re McNally, supra*, at 307 (forging a sheriff's name to a deed of foreclosure resulted in a two year suspension); *In re Fleisher, supra*, 66 *N.J.* at 400–01 (creating a fictitious judgment of divorce resulted in an indefinite suspension pending continued psychotherapy). The Board notes, however, that additional serious ethics charges are still pending. Therefore, a majority of the Board withholds recommendation of the specific penalty to be imposed and recommends instead the immediate indefinite suspension of respondent from the practice of law pending resolution of all ethics complaints currently pending. Further, the Board has directed the District XI Ethics Committee to hold formal hearings on all pending charges within 45 days; the committee's findings shall be immediately forwarded to the Board in order for the Board to reschedule this matter within 90 days. The Board has also directed the Office of Attorney Ethics to audit respondent's attorney accounts immediately.

Three members of the Board recommend disbarment on the basis of the above infractions.

As the DRB found, we have suspended attorneys who have forged documents, even when they have not profited from their misconduct. Other cases of forgery have resulted in the imposition of varying periods of suspension. In *In re McNally*, 81 *N.J.* 304 (1979), an attorney who forged the name of the county sheriff on a deed of foreclosure to conceal the attorney's failure to file necessary foreclosure papers was suspended for two years, and in *In re Yacavino*, 100 *N.J.* 50 (1985), an attorney who forged two court orders in an adoption proceeding was suspended for three years. Finally, in *In re Fleisher*, 66 *N.J.* 398 (1975), we deferred suspension of an attorney who delivered a fictitious divorce judgment to his client. The attorney was receiving regular psychiatric treatment during the ethics proceedings, and we entered an order indefinitely suspending him pending the continued psychotherapy.

The question before us is not whether respondent committed an ethical infraction. He admits as much. Rather, the issue is the determination of the sanction to be imposed for the infraction committed. That determination is complicated because the unrelated pending charges cannot be presented to the District XI Ethics Committee for several months. We are disinclined to disbar respondent for the present offense, and we shall be

better able to determine the appropriate sanction after the completion of the proceedings involving the other charges.

Like the DRB, we believe the appropriate discipline in the present case is to suspend respondent pending the outcome of the two other disciplinary matters. To assure a prompt disposition of those matters, we direct that they be accelerated. In the meantime, respondent is suspended from the practice of law on an indefinite basis subject to the further order of this Court.

Respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs, including the costs of transcripts.

So ordered.

*For suspension* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed* —None.

## ORDER

It is ORDERED that NORMAN J. CHIDIAC of PATERSON, who was admitted to the bar of this State in 1970, be suspended from the practice of law on an indefinite basis until further order of this Court; and it is further

ORDERED that NORMAN J. CHIDIAC reimburse the Ethics Financial Committee for appropriate administrative costs; and it is further

ORDERED that NORMAN J. CHIDIAC be restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that NORMAN J. CHIDIAC comply with Administrative Guideline Number 23 of the Office of Attorney Ethics dealing with suspended attorneys.